**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**DEBORAH LYNN KLINE,**
INDIVIDUALLY AND AS
ADMINISTRATOR OF THE ESTATE
OF WAYNE D. DAVIS, JR.
21199 Bivalve Lodge Road
Bivalve, MD 21814 (Wicomico Couty)

and

**DEMI' MONAE TURNER, AS NEXT FRIEND OF A.T., A MINOR CHILD**
102 Chestnut Tree Rd.
Hebron, MD 21830 (Wicomico County)

Plaintiffs,

v.

**WICOMICO COUNTY**
**c/o John Psota, Acting County Executive**
125 N. Division St. Room 203
PO Box 870
Salisbury, MD 21803 (Wicomico County)

and

**DELBE THIBEAU**
Serve at: Wicomico County Detention Center
411 Naylor Mill Road
Salisbury, Maryland 21801 (Wicomico County)

and

**BRIAN THOMPSON**
Serve at: Wicomico County Detention Center
411 Naylor Mill Road

Case No.________________________

Jury Trial Demanded

Salisbury, Maryland 21801 (Wicomico County) *
*
*
and *
*
**DERRICK HUMPHREY** *
Serve at: Wicomico County Detention Center *
411 Naylor Mill Road *
Salisbury, Maryland 21801 (Wicomico County *
*
*
Defendants *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**COMPLAINT AND JURY DEMAND**

Plaintiffs, Deborah Lynn Kline, Individually and as Administrator of the Estate of Wayne D. Davis, Jr., and Monae Turner as next friend of A.T., allege as follows:

1. This is an action arising from the suicide of Wayne Davis while he was a pretrial detainee in the custody of the Wicomico County Department of Corrections. [1]

2. Mr. Davis' death was caused by the deliberate indifference and negligence or gross negligence of the correctional staff at Wicomico County Detention Center employed by Wicomico County, and by the deliberate indifference and gross negligence or negligence of the healthcare personnel at WCDC, employed by Wicomico's contractor, Wellpath, LLC.

3. At all relevant times, all defendants were acting under color of state law.

[1] Plaintiffs also filed similar claims against Wellpath, LLC, the health care provider at WCDC during Mr. Davis' detention, as well as the individual providers identified herein, in Maryland Health Care Alternative Dispute Resolution Office. Plaintiffs intend to waive arbitration pursuant to Md. Courts and Judicial Proceedings, § 3-2A-06(b), re-file in this Court, and move for consolidation of the two matters.

**PARTIES**

4. Plaintiff, Deborah Lynn Kline, Individually and as Administrator of the Estate of Wayne D. Davis, Jr., is a resident of Salisbury, Maryland. Ms. Kline is the mother of decedent Wayne Davis. A copy of the Letters of Administration is attached as Exhibit A.

5. Plaintiff, Demi'Monae Turner, is the next friend of A.T., a minor, and the surviving natural child of Mr. Davis.

6. Defendant Wicomico County is an entity of local government of the State of Maryland that, by virtue of the Maryland Constitution and the Wicomico County Charter, is a body corporate and politic that possesses the rights of self-government and home rule. Wicomico County owns, and through its Department of Corrections, operates the Wicomico County Detention Center. Wicomico County was responsible for the policies, practices, customs, and regulations governing and used at WCDC and for the misconduct, acts, and omissions of its employees, agents, or servants. Plaintiff provided notice of this claim to Wicomico County, pursuant to Md. Code Ann., Cts. & Judicial Proc. § 5-304, on or about September 24, 2019. A copy of the letter is attached as Exhibit B.

7. At all relevant times, Defendant Delbe Thibeau was a correctional officer employed by Defendant Wicomico County at WCDC.

8. At all relevant times, Defendant Brian Thompson was a correctional officer employed by Defendant Wicomico County at WCDC.

9. At all relevant times, Defendant Derrick Humphrey was a correctional officer employed by Defendant Wicomico County at WCDC.

10. At all relevant times, Wellpath, LLC is a Limited Liability Company that provides health care services at correctional facilities nationwide. On information and belief, Wicomico County contracted with an entity called Conmed for the provision of medical and mental health care at WCDC in the early 2000s. Conmed was acquired by Correct Care Solutions in 2012, and CCS was acquired by Wellpath in 2019. CCS was the named entity providing services at WCDC during the events of this case. CCS is a wholly-owned subsidiary of Wellpath and the two entities operate as one.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331, as this case involves question of federal law, and, as to the remaining claims, pursuant to 28 U.S.C. §1367.

12. All Defendants either reside in, are employed in, or conduct substantial business in Wicomico County, Maryland and all the tortious acts or omissions giving rise to these claims were committed in Maryland. Venue is therefore proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

## FACTS

13. Wayne D. Davis, Jr. was 23 years old when he committed suicide by hanging while detained at WCDC in October 2018.

14. On information and belief, Mr. Davis never faced serious legal trouble before 2018.

15. He was arrested for the first time in February 2018 on charges including felony possession of CDS with intent to distribute and second degree assault. After posting bond, he was released.

16. Mr. Davis was then arrested in April 2018 on charges including first degree burglary and felony accessory-after-the-fact.

17. During his 17-day detainment at WCDC in April, Mr. Davis was placed on suicide watch after exhibiting signs of sadness and hopelessness.

18. After praying a jury trial and posting bond, Mr. Davis was again released awaiting disposition of his charges. He then failed to appear for his court dates and a warrant was issued for his arrest.

19. When he was admitted to WCDC in October 2018, Mr. Davis was facing multiple serious charges and was denied bond.

20. During his medical screening, Mr. Davis' fragile emotional state was evident. He falsely asserted that his mother had committed suicide, causing a referral for mental health evaluation.

21. On information and belief, Mr. Davis' previous placement on suicide watch required a mental health referral regardless of the false assertion of familial suicide.

22. On information and belief, Wellpath policy required an evaluation by a mental health professional within 24-48 hours of the referral, but no evaluation occurred over the ensuing seventeen days.

23. On October 3rd, Mr. Davis requested assistance from correctional staff. During the interaction, CO Beebe overheard Mr. Davis' cellmate referring to Mr. Davis

as a "rat" and a "snitch."

24. Mr. Davis told CO Beebe that he feared for his life and wanted to be moved, and made the following statement in the incident report:

> "I fear for my life, have had alot [sic] of threats. I don't know any names I just arrived today."

25. Mr. Davis was placed on administrative segregation, where he was locked down for twenty-three hours each day, and had limited interaction with other people.

26. Placement in segregation housing is a known risk factor for suicide, especially in detention center settings.

27. Mr. Davis was also at higher risk for suicide because he was facing new, serious legal problems.

28. Studies show that young, white, single males in pretrial detention are at disproportionately high risk for suicide when compared to other similarly situated individuals.

29. On information and belief, Wellpath policy requires that any detainee placed in segregation be evaluated for their fitness for confinement under such conditions. Here, no such evaluation took place until Mr. Davis was in segregation for four days.

30. Besides being untimely, Wellpath's policy was to delegate this critical evaluation to an LPN with no mental health training.

31. On October 4th, correctional staff tried to move Mr. Davis back to general population but he refused and correctional issued a disciplinary sentence of ten days in

segregation.

32. Mr. Davis explained his actions by asserting that he feared for his life, writing that "I can't move anywhere because everyone knows my situation. I am requesting [protective custody]."

33. This fear, when related to recent negative or humiliating experiences, such as being labeled a "rat" or "snitch" is a further risk factor for jail suicide.

34. On information and belief, besides the evaluation required by Wellpath's initial mental health referral, Wellpath's policy, and the industry standard of care requires, at a minimum, weekly rounds completed by a qualified mental health care provider.

35. Despite multiple risk factors for jail suicide, Mr. Davis never interacted with a licensed mental health care professional.

36. On October 7th, LPN Rose finally completed a "Pre-Segregation Health Evaluation" for Mr. Davis but ignored that a previous mental health referral remained incomplete, and judged Mr. Davis fit for segregation.

37. On October 10th and October 17th, Mr. Davis was apparently visited by Jenna Haines, an intern with Wellpath.

38. On information and belief, Ms. Haines held no medical licenses or certifications, and was in school studying to become a social worker.

39. On information and belief, Patricia Annette Brown, a licensed social worker-clinical employed by Wellpath as the Mental Health Coordinator, supervised Ms. Haines and was responsible for ensuring that mental health referrals were completed.

40. On information and belief, Ms. Brown later tried to alter the electronic medical record to falsely suggest that a timely mental health evaluation occurred after the referral.

41. During Mr. Davis' detention in segregation housing, he sometimes wrote in a make-shift journal, and the entries brim with expressions of hopelessness and despair.

42. In one entry he wrote, "I let the ones that mean the most to me completely down," and, "I don't deserve to live." He continued, "I wanna give up so darn bad and beat my head till I won't feel a thing anymore."

43. In another, he wrote, "I'm in a gloom today. I'm in a deep depression," and, "I don't know which way to turn to even begin to get out of this state of mind."

44. Because of the risks associated with solitary confinement, in addition to the mental health visits indicated by Wellpath policy and the standard of care, Wicomico policy required that all detainees in segregation undergo a welfare check by correctional staff every thirty minutes.

45. On October 19th, correctional officers Delbe Thibeau, Brian Thompson, and Derrick Humphrey were assigned to B-Block, which included the disciplinary pod where Mr. Davis was housed.

46. The correctional staff was required to keep a log of the required welfare checks, initialing next to each half-hour increment after a check was completed.

47. On October 19th, CO Thibeau collected Mr. Davis' lunch tray at about 11:10 hours, and CO Humphrey initialed the segregation log for the 11:00 check.

48. About two hours later, Ms. Kline called WCDC because Mr. Davis missed

his regular call with her. The WCDC employee that spoke with Ms. Kline called B-Block and asked CO Thibeau to check on Mr. Davis.

49. CO Thibeau went to BF-Pod and found Mr. Davis hanging from a noose anchored to a bar over the cell window.

50. Surveillance footage reveals that none of the B-Block correctional officers entered the segregation pod during that time between 11:10 and 13:13 on October 19, yet CO Thibeau initialed the log, falsely suggesting that he performed welfare checks at 11:30 and 12:00.

51. None of Thibeau, Thompson, or Humphrey initialed for the required checks at 12:30 or 1:00.

52. Thibeau, Thompson, and Humphrey knowingly failed to complete four consecutive welfare checks on Mr. Davis and the other inmates/detainees in segregation.

53. Mr. Davis was not monitored from 11:10 to 13:13pm, when he was found unresponsive in his cell. This check was only completed in response to a welfare check requested by Mr. Davis's mother.

54. Mr. Davis never regained consciousness and was pronounced dead at 13:55 on October 19th.

**COUNT I**
**42 U.S.C. § 1983**
**Defendants Wicomico, Thibeau, Thompson, and Humphrey**

55. The preceding paragraphs are incorporated herein.

56. Mr. Davis was at all times a pretrial detainee at WCDC and was therefore

owed the protections of due process of law under the Fourteenth Amendment to the U.S. Constitution. Detainees and inmates are constitutionally entitled to detention in an environment that offers reasonable protection from harm.

57. At all relevant times, the Correctional Defendants owed Mr. Davis a duty to provide him with reasonable medical and mental health care, and to protect him from bodily injury.

58. At all relevant times, the Correctional Defendants knew that Mr. Davis was at an increased risk for jail suicide because, among other things, he was in segregation housing, facing serious legal consequences, and repeatedly expressed fear for his physical safety from other inmates.

59. The Correctional Defendants also knew that detainees in segregation housing required welfare checks at thirty-minute intervals, and the failing to perform the required checks substantially increased the risk that a detainee could commit suicide.

60. Exacerbating this risk, the Correctional Defendants took no steps to make segregation cells less conducive to suicide. It is well known that a vast majority of jail suicides are by hanging, and almost all of those use bedding anchored to a high point in the cell.

61. Mr. Davis was left alone in a cell with bedding and a "bar" across a high window that was easily used as an anchor point for the noose Mr. Davis constructed with his bedding.

62. With this knowledge, the Correctional Defendants, with deliberate indifference, failed to perform welfare checks every thirty minutes as required. Instead,

they merely initialed the segregation log to give the appearance that checks were complete.

63. On the day he committed suicide, the Correctional Defendants deliberately missed four consecutive welfare checks, leaving Mr. Davis, a detainee at increased risk for suicide, alone in his cell for more than two hours, and this egregious period was interrupted only when Mr. Davis' mother called to express concern.

64. Wicomico acted with deliberate indifference by allowing a widespread custom or policy of failing to perform the required checks on inmates and detainees in segregation. On the day of Mr. Davis' suicide, there was ample opportunity for Thibeau, Humphrey, and Thompson to perform the required checks. Instead, they merely initialed the log without checking on Mr. Davis.

65. That three correctional officers, and the pod control officer that monitors coming and going, actively participated in the fraudulent recording of welfare checks while leaving detainees unchecked in segregation for hours at a time is evidence that the practice was widespread enough to be considered an official policy.

66. Wicomico knew that failing provide adequate monitoring to detainees at risk for suicide substantially increased the likelihood that a detainee would commit suicide, and it acted with deliberate indifference in establishing this unwritten policy.

67. Wicomico County has been on actual notice of these deficiencies since at least 2002, when the Department of Justice issued a report outlining, among other things:

a. That Wicomico County must perform mental health screening on inmates/detainees within 24 hours of processing;

b. That, regarding inmates at risk for self-harm, Wicomico County must implement a mental health treatment plan prepared by mental health professionals; and

c. That Wicomico County must provide and document the appropriate prescription of medicine to treat mental illness.

68. As a direct and proximate result of their deliberate indifference, the Correctional Defendants deprived Mr. Davis of his constitutional right to adequate medical care for his serious medical need, and caused Mr. Davis severe physical pain and mental anguish before his death.

WHEREFORE, Plaintiff Deborah Lynn Kline, as personal representative of the Estate of Wayne D. Davis, Jr., requests that the Court enter judgment in her favor and against all Defendants, jointly and severally, as follows: (1) for compensatory damages of $5,000,000.00, which amount will be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted under 42 U.S.C. § 1988; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted Wicomico County acted with deliberate indifference in creating and implementing these policies and in failing to remedy known deficiencies.

**COUNT II**
**Due Process – Article 24 of the Maryland Declaration of Rights**
**All Defendants**

69. The preceding paragraphs are incorporated herein.

70. At all relevant times, Defendants acted under color of the laws of the State of Maryland.

71. All actions of Defendants occurred within the course of their duty and the scope of their employment or agency as employees of Wicomico County or Wellpath or as employees contracted to act on their behalf and Maryland's constitution and its principles of respondeat superior liability obligate counties and municipalities to avoid constitutional violations by their employees and contract-employees through, among other things, adequate training and supervision and by discharging or disciplining negligent or incompetent employees/contract employees.

72. The Defendants deprived Mr. Davis of his life and liberty in violation of Article 24 of the Maryland Declaration of Rights when they knowingly failed to provide Mr. Davis with access to mental health care to mitigate his risk of suicide, and failed to provide adequate monitoring to Mr. Davis while he was in segregation housing. The Defendants knew Mr. Davis was at increased risk for suicide and consciously failed to take the necessary actions to protect his safety.

73. The Defendants' knowing disregard for Mr. Davis' serious medical need was malicious and with deliberate indifference and conscious disregard of Mr. Davis's safety and welfare.

74. The Defendants actions and omissions caused Mr. Davis's suicide and thus deprived Mr. Davis of his life and liberty as guaranteed by Article 24 of the Maryland Constitution.

WHEREFORE, Plaintiff Deborah Lynn Kline, as personal representative of the Estate of Wayne D. Davis, Jr., requests that the Court enter judgment in her favor and against Defendants jointly and severally as follows: (1) for compensatory damages of $5,000,000.00, which amount will be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted by law; and (5) for such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiffs demand a jury trial.

Date: October 15, 2021

LAW OFFICES OF PETER G. ANGELOS, P.C.

/s/ Nicholas C. Bonadio
Nicholas C. Bonadio (Bar No. 13679)
nbonadio@lawpga.com
Thomas W. Keilty, III (Bar No. 18992)
tkeilty@lawpga.com
100 N. Charles Street, 22nd Floor
Baltimore, Maryland 21201
Tel: (410) 649-2000
Fax: (410) 649-2150
*Attorneys for Plaintiff*

/s/ Ashley A. Boschè
Ashley A. Boschè (Bar No. 28800)
bosche@cbmlawfirm.com
313 Lemmon Hill Lane
Salisbury, Maryland 21801
Tel: (410) 546-1750
Fax: (410) 546-1811
*Attorneys for Plaintiff*