IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DEBORAH L. KLINE, et al.        *

    Plaintiffs,                     *

                                               Civil No.: BPG-21-2653

    v.                             *

WICOMICO COUNTY, et al.         *

    Defendants                   *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION**

The above-referenced case was referred to the undersigned for all proceedings with the consent of the parties, pursuant to 28 U.S.C. 636(c) and Local Rule 301.4. (ECF No. 30). Currently pending are defendant Wicomico County's Partial Motion to Dismiss ("Partial Motion to Dismiss") (ECF No. 38), plaintiffs' Opposition to Wicomico County's Partial Motion to Dismiss ("Opposition") (ECF No. 45), and defendant Wicomico County's Reply Memorandum in Support of Defendant's Partial Motion to Dismiss ("Reply") (ECF No. 48). No hearing is deemed necessary. Loc. R. 105.6. For the reasons discussed herein, defendant Wicomico County's Partial Motion to Dismiss (ECF No. 38) is GRANTED.

**I.     BACKGROUND**

This case involves the death of Wayne Davis, Jr. ("decedent"), who committed suicide by hanging on October 19, 2018, while he was a pretrial detainee at the Wicomico County Department of Corrections ("WCDC"). (ECF No. 1 at 4 ¶ 13). The following facts are alleged by plaintiffs

Deborah Kline and Demi'Monae Turner ("plaintiffs") in their Complaint.[1]  Decedent was first admitted to WCDC in April 2018 on charges including first degree burglary and felony accessory after-the-fact.  (Id. at 5 ¶ 16).  During his 17-day detainment at WCDC in April 2018, decedent was placed on suicide watch.  (Id. ¶ 17).  Decedent was eventually released after posting bond, but when he failed to appear for his court dates while awaiting trial, he was rearrested and admitted again to WCDC in early October 2018.  (Id. ¶¶ 18-19).

Prior to his death, decedent exhibited a "fragile emotional state" and falsely claimed that his mother committed suicide.  (Id. ¶ 20).  Decedent also told a correctional officer that he wanted to be moved because he feared for his life based on statements made by his cellmate.  (Id. at 5-6 ¶¶ 23-24).  Decedent was subsequently placed on administrative segregation.  (Id. at 6 ¶ 25).  As a result, decedent was placed in solitary confinement for 23 hours per day and had limited interaction with other people.  (Id.)  While in segregated housing, decedent expressed feelings of "hopelessness and despair," writing in his journal that he did not "deserve to live" and was "in a deep depression."  (Id. at 8 ¶¶ 41-43).  Plaintiffs further allege that decedent was known by defendant to be at a high risk for suicide based on decedent's placement in segregated housing, serious legal problems, fear of harm caused by his cellmate, and demographic characteristics, including age, race, and marital status.  (Id. at 6-7 ¶¶ 26-28, 33).

To ensure the safety of detainees at risk for suicide and those placed in segregated housing, WCDC required correctional staff to conduct "welfare checks" of all detainees every 30 minutes and to record each welfare check in a logbook.  (Id. at 8 ¶¶ 44, 46).  On October 19, 2018, correctional officer Derrick Humphrey conducted a welfare check of decedent at 11:00 a.m. and

---

[1] Plaintiff Deborah Kline is the mother of decedent and administrator of decedent's estate.  (ECF No. 1 at 3 ¶ 4).  Plaintiff Demi'Monae Turner is the next friend of A.T., a minor, and the surviving natural child of decedent.  (Id. ¶ 5).

recorded it in a logbook.  (Id. ¶ 47).  At 11:10 a.m., correctional officer Delbe Thibeau ("CO Thibeau") collected decedent's lunch tray.  (Id.)  Approximately two hours later, CO Thibeau entered decedent's segregation area in response to a call from decedent's mother and found decedent "hanging from a noose anchored to a bar over the cell window."  (Id. at 8-9 ¶¶ 48-50).  Decedent was pronounced dead at 1:55 p.m.  (Id. at 9 ¶ 54).

Plaintiffs allege that surveillance footage shows that none of the correctional officers assigned to decedent's cell entered the segregation area from 11:10 a.m. to 1:13 p.m., although CO Thibeau initialed the log, "falsely suggesting that he performed welfare checks at 11:30 and 12:00."  (Id. ¶ 50).  There is no record in the logbook of a welfare check at 12:30 p.m. or 1:00 p.m.  (Id. ¶ 51).  According to plaintiffs, the correctional officers "knowingly failed to complete four consecutive welfare checks on [decedent] and the other inmates/detainees in segregation" over the course of approximately two hours on the day of decedent's death.  (Id. ¶ 52).

On October 15, 2021, plaintiffs filed suit in this court against defendant Wicomico County ("defendant") on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331.[2]  (Id. at 4 ¶ 11).  Plaintiffs assert two counts against defendant: Count I – claim under 42 U.S.C. § 1983 based on a violation of due process under the Fourteenth Amendment and Count II – claim under Article 24 of the Maryland Declaration of Rights.  (Id. at 9-13).  Plaintiffs argue that defendant

---

[2] Defendant's Partial Motion to Dismiss concerns defendant Wicomico County only.  Plaintiffs, however, also brought suit against three correctional officers employed by Wicomico County, including Delbe Thibeau, Brian Thompson, and Derrick Humphrey.  (ECF No. 1 at 3-4 ¶¶ 7-9).  In addition, on April 7, 2022, the court granted plaintiffs' Consent Motion to Consolidate this case with a related case—Kline, et al. v. Wellpath, et al., BPG-21-3174.  (ECF No. 49).  As a result of the consolidation, Wellpath LLC—a company contracted by Wicomico County to provide health care services to detainees—and two individuals employed by Wellpath, Patricia Brown and Mike Rose, were added as defendants in this case.

failed to provide decedent access to mental health care to mitigate his risk of suicide[3] and adequately monitor decedent while he was in segregated housing. (Id.) Defendant moves to dismiss plaintiffs' Complaint as to defendant only pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (ECF No. 38 at 1).

## II.  STANDARD OF REVIEW

Under Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). When ruling on such a motion, the court must "accept[] all well-pleaded allegations in the plaintiff's complaint as true" and "draw[] all reasonable factual inferences from those facts in the plaintiff's favor." Id. at 244. Nonetheless, "[t]he mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Rather, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." Ashcroft, 556 U.S. at 678 (internal citation and quotation marks omitted). A plaintiff satisfies this standard not by forecasting evidence sufficient to prove the elements of the claim, but by alleging sufficient facts to establish those elements. Walters, 684 F.3d at 439. Accordingly, "while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,'

---

[3] Plaintiffs allege that decedent "never interacted with a licensed mental health care professional" despite his risk for suicide. (ECF No. 1 at 7 ¶ 35). In addition, plaintiffs assert that decedent did not receive a timely "Pre-Segregation Health Evaluation" or weekly rounds of mental health treatment with a licensed mental health care professional. (Id. at 6-8 ¶¶ 29-30, 34-40).

the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

**III.   DISCUSSION**

Defendant argues that plaintiffs fail to state a claim for municipal liability under 42 U.S.C. § 1983 and Article 24 of the Maryland Declaration of Rights.[4] (ECF No. 38-1 at 4). A municipality is liable under Section 1983 if it "causes a deprivation through an official policy or custom." Peters v. City of Mount Rainier, No. GJH-14-00955, 2014 WL 4855032, at *4 (D. Md. Sept. 29, 2014) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978)). A municipality, however, is liable only for its own illegal acts and may not be held liable under the theory of respondeat superior solely for the acts of an employee. Owens v. Balt. City State's Attorneys Office, 767 F.3d 379, 402 (4th Cir. 2014) (citing Monell, 436 U.S. at 691). "Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the *sine qua non* of *Monell* liability." Id. (emphasis in original).

There are four ways to show the existence of a custom, policy, or practice: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a [condoned] practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" Peters, 2014 WL 4855032, at *5 (quoting Ltyle v. Doyle, 326 F.3d 463, 471

---

[4] As a preliminary matter, "Article 24 of the Maryland Declaration of Rights is the state law equivalent of the Fourteenth Amendment of the United States." Verderamo v. Mayor and City Council of Balt., 4 F. Supp. 3d 722, 732 (D. Md. 2014) (quotation marks omitted). The analysis under Article 24, therefore, is the same as the analysis of a Section 1983 claim based on a violation of the Fourteenth Amendment. Id.; see also Spicknall v. Spencer, No. RDB-15-3418, 2016 WL 3402690, at *4 (D. Md. June 21, 2016).

(4th Cir. 2003)). In this case, defendant contends that plaintiffs fail to state a claim for municipal liability based on a theory of (1) condonation, (2) failure to train, and (3) failure to supervise or discipline. (ECF No. 38-1 at 4-9). Defendant's arguments are addressed in turn below.

**A. Condonation**

Defendant argues that plaintiffs fail to state a claim for municipal liability based on a theory of condonation because plaintiffs fail to plead widespread violations. (Id. at 6-7). To state a condonation claim under Section 1983, plaintiffs "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" Owens, 767 F.3d at 402 (quoting Spell v. McDaniel, 824 F.2d 1380, 1386-91 (4th Cir. 1987)). "Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct." Id. at 402-03 (quoting Spell, 824 F.2d at 1391). Only allegations of widespread or flagrant violations of rights—not sporadic or isolated violations—are sufficient. Id. at 403. In addition, plaintiff must allege that there is "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989). "Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." Owens, 767 F.3d at 403. A plaintiff, however, fails to state a claim "when he offers 'labels and conclusions' or formulaically recites the elements of his § 1983 cause of action." Id. (quoting Iqbal, 556 U.S. at 678).

Here, defendant argues that plaintiffs rely solely on the isolated conduct of three correctional officers on a single day and "fail to plead any other examples that might establish the 'widespread' conduct that is necessary to establish a tacit policy by condonation." (ECF No. 38-1 at 6-7). Contrary to defendant's position, plaintiffs assert that the correctional officers' conduct

was widespread and flagrant.  (ECF No. 45 at 4).  Specifically, plaintiffs contend that each of the three correctional officers and a fourth 'pod control officer' "acted with deliberate indifference both in failing to complete *each* missed welfare check on [decedent] and the other segregated detainees/inmates and . . . in fraudulently recording that at least two of the missed welfare checks occurred." (Id. at 5) (emphasis in original).  Further, plaintiffs argue in their Opposition that they have identified "dozens of individual acts of deliberate indifference," including the missed welfare checks on other detainees and inmates, and that while all of the alleged bad acts occurred within a single day, the correctional officers' behavior suggests "a collective state of mind among correctional officers that they can ignore the prescribed welfare checks without fear of discipline." (Id.)  The only plausible scenario, plaintiffs contend in their Opposition, is that by October 19, 2018—the day of decedent's death—"the correctional officers had become 'comfortable' with ignoring or forging [sic], the prescribed checks after repeatedly doing so without consequences over some period preceding the events of the Complaint."  (Id. at 5-6).

Plaintiffs, however, make no such allegations in their Complaint.  The only allegation in the Complaint of a "widespread" practice is that three correctional officers and one pod control officer failed to perform four consecutive welfare checks of decedent and other detainees and inmates and actively participated in the fraudulent recording of welfare checks over the course of approximately two hours on a single day—October 19, 2018. (ECF No. 1 at 9-11 ¶¶ 52-53, 63-66).  These allegations are not sufficient to state a condonation claim.  Compare Ross v. Prince George's Cnty., Md., No. DKC-11-1984, 2012 WL 1204087, at *9 (D. Md. April 10, 2012) (granting motion to dismiss municipal liability claim when plaintiff alleged that police officers had a policy of using excessive force but plaintiff otherwise failed to provide any factual allegations beyond those surrounding his own injury and arrest) and Lyles v. Prawdzik, No. PWG-15-1056,

2016 WL 3418847, at *5 (D. Md. June 22, 2016) (granting same and holding that a "single instance is not 'numerous'" and does not establish a custom or practice), with Owens, 767 F.3d at 403-04 (denying motion to dismiss plaintiff's condonation claim when plaintiff alleged "reported and unreported cases" of similar violations and the successful filing of "a number of motions"), Jones v. Jordan, No. GLR-16-2662, 2017 WL 4122795, at *10 (D. Md. Sept. 18, 2017) (denying same when plaintiff alleged prior improper Terry stops and referenced thousands of previous arrests), Jones v. Chapman, ELH-14-2627, 2015 WL 4509871, at *14 (D. Md. July 24, 2015) (denying same when plaintiff alleged use of excessive force by defendant on multiple occasions "in recent years"), Corbitt v. Balt. City Police Dep't, RDB-20-3431, 2022 WL 846209 (D. Md. March 22, 2022) (denying same when plaintiff alleged six prior lawsuits and five specific instances in which defendant committed similar violations, as well as a DOJ investigation into defendant's "pattern of excessive force"), and Washington v. Balt. Police Dep't, 457 F. Supp. 3d 520, 536 (D. Md. 2020) (denying same when plaintiff alleged that defendant's policy of fabricating evidence and suppressing exculpatory evidence was firmly entrenched by the time of the events of the complaint, and plaintiff cited to four separate examples of similar violations).

Plaintiffs, however, argue that they need not plead multiple prior instances of similar conduct. (ECF No. 45 at 6-7). Rather, plaintiffs assert that at the motion to dismiss stage, "it is enough to merely allege that Wicomico officials were aware of ongoing constitutional violations, and that Wicomico's condonation of [the correctional officers'] conduct allowed a pattern or practice of unconstitutional actions to develop." (ECF No. 45 at 6-7) (citing Garcia v. Montgomery Cnty., Md., No. JFM-12-3592, 2013 WL 4539394, at *14-15 (D. Md. Aug. 23, 2013)). In Garcia, a journalist brought a Section 1983 claim against Montgomery County, Maryland after county police officers unlawfully prevented him from recording police activity in

public view despite the county's media relations policy, which provided that police should maintain a cooperative working relationship with journalists. 2013 WL 4539394, at *1-2. Specifically, the plaintiff alleged that the county had a policy or custom of failing to supervise and discipline officers who violated the media relations policy. Id. at *5. The plaintiff further alleged that the county conducted an inadequate investigation of his incident that "effectively sanctioned and endorsed" his mistreatment. Id. The county, however, argued that the plaintiff failed to state a claim for municipal liability because he alleged facts pertaining only to his incident, a mere isolated violation. Id. The court rejected the county's argument and denied its motion to dismiss, holding that plaintiff stated a valid Monell claim based on allegations that the defendant was aware of ongoing constitutional violations yet decided to ignore the misconduct. Id.

Unlike the plaintiff in Garcia, however, plaintiffs in this case fail to allege that defendant was aware of ongoing constitutional violations by correctional officers. Instead, plaintiffs allege in a conclusory manner that defendant "acted with deliberate indifference by allowing a widespread custom or policy of failing to perform the required checks on inmates and detainees in segregation." (ECF No. 1 at 11 ¶ 64). In addition, while plaintiffs allege that correctional officers "deliberately missed four consecutive welfare checks" of decedent and other inmates and detainees in segregation (id. at 9-11 ¶¶ 52, 63)—in violation of defendant's policy requiring correctional officers to perform and record welfare checks every 30 minutes (id. ¶ 46)—plaintiffs fail to set forth facts in the Complaint with respect to defendant's condonation of the officers' alleged violations, including allegations that defendant had actual or constructive knowledge of any violations. Plaintiffs' allegations in the Complaint span a period of only two hours on a single day and, unlike the plaintiff in Garcia, who alleged that the defendant's inadequate investigation of police misconduct effectively sanctioned and endorsed such misconduct, plaintiffs here did not

allege any similar facts from which municipal liability could be inferred. "Even if County officers violated Plaintiffs' constitutional rights, these violations alone do not permit an inference of municipal culpability, which only attaches if Plaintiffs adequately plead a policy or custom." Ulloa v. Prince George's Cnty., Md., No. DKC-15-0257, 2015 WL 7878956, at *6 (D. Md. Dec. 4, 2015). In sum, plaintiffs do not allege sufficient facts to permit a reasonable inference that defendant condoned a widespread practice of failing to perform or fraudulently recording welfare checks. Accordingly, plaintiffs fail to state a claim for municipal liability based on a theory of condonation.

### B. Failure to Train

Defendant asserts that plaintiffs fail to state a claim for municipal liability based on a failure to train the correctional officers. (ECF No. 38-1 at 7-8). To state a claim for municipal liability based on a failure to train, plaintiff must allege facts showing (1) the nature of the training; (2) that any failure to train was a "deliberate or conscious" choice by defendant; and (3) that the correctional officers' conduct was caused by a failure to train. Drewry v. Stevenson, No. WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010). Here, as defendant notes, plaintiffs have not alleged any facts with respect to the above three elements, including, most notably, the nature of defendant's training or any "specific deficiency" in training.[5] Spell, 824 F.2d at 1390. Plaintiffs

---

[5] In their Opposition, plaintiffs speculate that defendant "provided such constitutionally deficient training that the individual officers did not appreciate the purpose or need for welfare checks with inmates in segregation." (ECF No. 45 at 6). Plaintiffs further argue that "[i]f the correctional officers were not trained on the suicide risk associated with segregation housing and the importance of the prescribed welfare checks, the type of constitutional harm inflicted here was a near certainty." (Id.) Plaintiffs' arguments, however, are not only vague and conclusory, but they also fail to point to any facts in the Complaint showing the nature of defendant's training, that any failure to train was a deliberate or conscious choice by defendant, and that the failure to train caused the correctional officers' misconduct. See Drewry, 2010 WL 93268, at *4 (dismissing plaintiff's municipal liability claim against the defendant county in part because the complaint alleged no facts as to the three elements of a failure to train claim).

reference "training" only twice in their Complaint. First, plaintiffs allege that defendant Wellpath delegated a critical mental health evaluation to a nurse "with no mental health training." (ECF No. 1 at 6 ¶ 30). This allegation, however, does not address the nature of the training provided by Wicomico County specifically and, therefore, is irrelevant for purposes of determining whether plaintiff adequately stated a claim for municipal liability based on a failure to train. Second, plaintiffs allege in their Complaint that "principles of respondeat superior obligate [defendant] to avoid constitutional violations by their employees and contract-employees through, among other things, adequate training . . . ." (Id. at 13 ¶ 71). Plaintiffs, however, do not adequately plead the nature of defendant's training or any of the other elements of a failure to train claim by merely referencing defendant's *obligation* to provide adequate training. Accordingly, plaintiffs fail to state a claim for municipal liability based on a failure to train.

### C. Failure to Supervise or Discipline

Finally, defendant asserts that plaintiffs fail to state a claim for municipal liability based on a failure to supervise or discipline the correctional officers. (ECF No. 38-1 at 8-9). To state a claim for municipal liability based on a failure to supervise or discipline, plaintiff must allege: "(1) that the supervisor had 'actual or constructive knowledge' that a subordinate was engaged in conduct that 'posed a pervasive and unreasonable risk of constitutional injury'; (2) that the supervisor's response to that knowledge 'was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) an 'affirmative causal link' between the supervisor's inaction and the plaintiff's alleged constitutional injury." Brown v. Bratton, No. ELH-19-1450, 2020 WL 886142, at *34 (D. Md. Feb. 21, 2020) (quoting Wilkins v. Montgomery, 751 F. 3d 214, 226 (4th Cir. 2014)). A failure to supervise, however, "gives rise to municipal liability 'only in those situations in which there is a history of widespread

abuse.'" Cottman v. Balt. Police Dep't, 2022 WL 137735, at *9 (D. Md. Jan. 13, 2022) (citing Washington v. Balt. Police Dep't, 457 F. Supp. 3d 520, 537 (D. Md. 2020)).

Here, as discussed above with respect to condonation, plaintiffs fail to allege in their Complaint that the correctional officers engaged in a widespread practice of ignoring or fraudulently recording welfare checks or that defendant had actual or constructive knowledge of ongoing constitutional violations by the correctional officers. See supra, at 6-10. As a result, plaintiffs fail to state a claim for municipal liability based on a failure to supervise or discipline. Accordingly, dismissal of plaintiffs' claims as to defendant Wicomico County only is warranted.

## IV. CONCLUSION

For the foregoing reasons, defendant Wicomico County's Partial Motion to Dismiss (ECF No. 38) is GRANTED. A separate order will be issued.

May 16, 2022                                              /s/
                                                          Beth P. Gesner
                                                          Chief United States Magistrate Judge